# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEBRASKA

| | |
|---|---|
| In re: Nickolas Todd Seevers,<br><br>        Debtor. | Bankruptcy No.: 15-41941-SKH<br><br>Chapter 7 |
| MarPad, L.L.C., a Nebraska Limited Liability Company, Catherine Martinez and Jose Padilla-Ruezga,<br><br>        Plaintiffs,<br><br>vs.<br><br>Nickolas Todd Seevers,<br><br>        Defendant. | Adversary No.: 16-4009 |

## MEMORANDUM AND ORDER

Plaintiffs MarPad, L.L.C., Catherine Martinez and Jose Padilla-Ruezga filed a Complaint seeking denial of Debtor/Defendant Nickolas Todd Seevers' bankruptcy discharge under 11 U.S.C. § 727.  Alternatively, Plaintiffs seek a determination that Debtor's debt to Plaintiffs is excepted from discharge under 11 U.S.C. § 523(a)(2), (a)(4) and (a)(6).

In his Answer, Debtor denies the allegations.  He affirmatively alleges that Plaintiffs breached the covenant of fair dealing and good faith in their contractual obligations with Debtor by intentionally hindering Debtor's performance of his obligations.  Debtor asserts that Plaintiffs should be estopped from any alleged claim based on their bad faith.  He further asserts that Plaintiffs failed to perform their contractual obligations to Debtor and should be barred from bringing this action.  Lastly, he asserts that the alleged acts occurred more than one year prior to his bankruptcy petition date.

This adversary action is a core proceeding under 28 U.S.C. § 157(b)(2)(I).  The Court has jurisdiction under 28 U.S.C. §§ 1334 and 157, and it has authority to enter a final order in this matter.  This opinion constitutes findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

## I.    FACTUAL BACKGROUND

MarPad, L.L.C., is a Nebraska limited liability company that owned and operated a restaurant, bar and camping area under the name "Lakehouse Bar & Grill" ("the Lakehouse") outside North Platte, Nebraska.  Martinez and Padilla-Ruezga, who are married, owned 1,000 membership units comprising 100% of MarPad's membership units.

MarPad purchased the Lakehouse on April 1, 2010.  At the time, Martinez and Padilla-Ruezga lived in Colorado, and Martinez traveled to Nebraska to run the Lakehouse on the weekends while Padilla-Ruezga and their three children remained in Colorado.

In the summer of 2010, Plaintiffs operated a convenience store and campground at the Lakehouse.  For a new business, the Lakehouse "did pretty well" and the lake residents supported the Lakehouse, according to Martinez.  The Lakehouse's profits were "not great," but Martinez considered it a long-term investment.

In 2012, Martinez moved to Nebraska to run the Lakehouse full time.  By the end of 2013, she decided to return to Colorado.  In January 2014, she contacted an agent to list the Lakehouse for sale.  If the Lakehouse did not sell by the end of July 2014, Martinez intended to close it for the season and to operate the Lakehouse during the summer months only in subsequent years.

### A.    Debtor Meets Martinez and Executes Agreements with Plaintiffs

Debtor holds bachelor's and master's degrees in hotel and resort management.  Prior to his involvement with the Lakehouse, Debtor purchased and operated a bar called the Red Zone.  According to Debtor, the Red Zone "did phenomenal" until a compressor started a fire.  The Red Zone was not properly insured, and Debtor did not have the funds to operate the business after the fire.  Debtor closed the Red Zone in the last week of November 2013.

In the spring of 2014, Debtor was working at Applebee's when he met Steph Hopson.  Hopson worked for Martinez the previous summer, and Martinez told Hopson that she was looking for staff to operate the Lakehouse during the summer of 2014.  Hopson agreed to talk to people who might be interested.  Hopson introduced Debtor to Martinez, and Martinez hired Debtor as a server in April 2014.  Hopson also resumed working at the Lakehouse in April 2014.

Hopson and Debtor considered purchasing the Lakehouse.  Martinez told Hopson and Debtor that she wanted a large down payment because she was not willing to turn over the Lakehouse without significant "skin in the game."  At trial, Martinez recalled telling Hopson and Debtor she wanted a $100,000 down payment.

Hopson and Debtor requested profit and loss statements from Martinez, but she gave them tax returns only.  For this reason, Hopson decided she was not interested in

purchasing the Lakehouse, but she continued working as a Lakehouse employee. Debtor decided to pursue the sale alone because he wanted to own a restaurant and he viewed the Lakehouse purchase as an opportunity.

Martinez gave Debtor access to the Lakehouse computer, but it contained limited information.  According to Debtor, sales totaled approximately $35,000 per month during the four months the Lakehouse was open in 2013.  Martinez did not provide Debtor any other financial information prior to the parties entering purchase and employment agreements.

By June 2014, Martinez planned to sell the Lakehouse to Debtor.  Debtor and Martinez consulted an attorney they both knew to draft the legal agreements.  According to Martinez, she wanted legal agreements in place because she was relocating and would not be around to monitor the business.  Although Martinez wanted a significant down payment, she agreed to forego this payment but insisted upon agreements divesting Plaintiffs of financial responsibility but retaining ownership until the sale closed.

## 1.    The Storm and Insurance Proceeds

In mid-June 2014, before the parties entered into purchase and employment agreements, a hailstorm significantly damaged the Lakehouse.  At Martinez's request, Debtor compiled a list of damaged property to submit with an insurance claim.  The storm shattered most of the glass patio tables; only two tables survived.  In addition to the patio tables, the damaged property included the roof, umbrellas, windows, air conditioner compressor, walk-in cooler/freezer compressor and the point-of-sale system.

Debtor assisted the insurance adjustor who visited the Lakehouse to assess the damage.  According to Debtor, the insurance company paid Martinez 70 percent of the cost of repairs immediately and agreed to pay the rest after the repairs were made.

The Lakehouse could not operate until Debtor purchased new patio tables. According to Debtor, he spent a total of $6,000 on tables, and Martinez did not reimburse him for any of the cost.  At trial, he explained that Martinez told him the insurance proceeds belonged to her.  Martinez, on the other hand, claimed that she reimbursed Debtor for the items he replaced after the insurance company sent her the insurance proceeds.

The insurance claim included $35,000 for a new point-of-sale system.  The point-of sale system recorded daily sales.  Consequently, it was critical for labor management, processing credit cards and communications between servers and kitchen staff.  Because of damage to the system, the computers would not stay synched and would periodically stop working.

Debtor researched replacement point-of-sale systems, but Martinez thought a new system was unnecessary and too expensive.  A local company repaired the

system, but it was just a "bandaid," according to Debtor.  The system continued to malfunction.

Beginning in July 2014, the system caused discrepancies in the reported cash. The impaired system affected the totals at the end of the day, including improperly accounting for servers' tips at the end of the night.  Unless an employee printed the daily closing report from each of the three points-of-sale, the data was incorrect. Further, when the system crashed, Debtor could not give customers their bills because he had no way to tell them how much they owed.  Debtor spent four to five hours per day dealing with issues caused by the faulty system.  Similarly, Hopson testified that the system had many problems and that Martinez was aware of them.  As a workaround, Hopson purchased her own iPad to track sales.

Debtor repeatedly told Martinez about the problems and "begged" her for a new point-of-sale system, particularly in light of the insurance proceeds Martinez received. Martinez acknowledged that Debtor expressed the difficulties of operating without a working system, but she considered the impaired system "a pain but not critical."

## 2.    The Agreements

On July 28, 2014, Debtor entered into an agreement to purchase MarPad from Martinez and Padilla-Ruezga, effective retroactively to July 1, 2014.  The purchase agreement outlined Debtor's payments for the Lakehouse.  Specifically, Debtor agreed to pay Martinez and Padilla-Ruezga $410,000 as follows: $10,000 by October 1, 2014; $60,000 by December 20, 2014; $60,000 by June 15, 2015; and the final payment of the outstanding balance of principal and interest on August 31, 2015.  The parties scheduled the sale closing for on or before August 31, 2015.  Although MarPad remained the owner of the Lakehouse until the closing, Debtor began managing the Lakehouse on July 1, 2014.  In other words, Debtor took control of all the assets at the Lakehouse, but he held no ownership interest.

Debtor and MarPad also entered an employment contract outlining Debtor's responsibilities on July 28, 2014.  The employment contract provided that MarPad would employ Debtor through August 31, 2015.  Debtor agreed to "devote his full-time efforts to his duties" as an employee.  The contract obligated Debtor to perform certain duties on behalf of MarPad including ordering inventory, supplies and furnishings for the Lakehouse.  The contract required:  "Any significant events or projects must be approved by Catherine Martinez prior to engaging in any activities including purchasing of new equipment and materials deemed necessary for business operations and growth and new building improvements or changes."  The employment contract provided that MarPad would have no out-of-pocket expenses after July 1.

The employment contract required Debtor to use an operating account for all general operating expenses.  It also required him to regularly deposit payments into a checking account, a payroll account and a reserve account.  MarPad continued to own all the accounts.  Under the Employment Contract, Debtor agreed to pay $10,000 for inventory within 60 days of the agreement.

The employment contract also provided, "As compensation for the services to be performed by [Debtor] under this Agreement, [Debtor] shall be paid the sum of $2,400.00 per month in two payments of $1,200.00 each per month."

## B.    Debtor Begins Managing The Lakehouse

On June 30, 2014, Debtor deposited $2,885.00 into the new operating account. The source of the deposit was an advance payment for an upcoming catering event.  At all of his previous jobs, Debtor had access to operating accounts and the authority to purchase any items he deemed necessary to run the businesses.  Debtor believed the same was true for the Lakehouse.  He thought he would manage the Lakehouse and that Martinez would "step out" as long as he fulfilled his obligation to make the payments.  Debtor testified that Martinez restricted his access to the accounts, however, giving him full access to the operating account only.  Debtor was a signator on the operating and payroll accounts.

Although Debtor thought he was a buying a turnkey operation, shortly before he took over management on July 1, 2014, many items were missing from the Lakehouse. According to Debtor, Martinez and her family took 16 or 17 tables, leaving only four or five.  She also took pots, pans and dishware.  Martinez's brother dismantled the hood vent.  Debtor scrambled to get the Lakehouse ready for the Fourth of July holiday weekend.  Hopson similarly testified that Martinez and her family took "lots of things" out of the Lakehouse.

Martinez acknowledged removing items from the Lakehouse including catering tables and two patio tables.  She claimed, however, that she left the items Debtor needed to operate.  She maintained that the items she took were not critical to operations, and they "all belonged to [her] anyway."

In early July, Debtor attended an auction and purchased a number of items necessary to run the business that he thought the Lakehouse purchase included when he assumed management.  The items he purchased included knives, food storage bins, spatulas, a stock pot, a microwave, frying pans, sauce pans and oven mitts.  He purchased additional items for the Lakehouse at a second auction in early August.  He also purchased some personal items at the second auction.  Debtor charged the items he purchased for the Lakehouse ($840.58) to the Lakehouse and paid cash ($1,960.00) for the personal items.  Although it was not unusual to purchase items from auctions for the Lakehouse, Martinez was unaware that Debtor purchased items for the Lakehouse at these particular auctions.

Initially, the Lakehouse opened on weekends only.  Debtor expanded its days of operation to Tuesday through Saturday and eventually to seven days a week.  Hopson and Debtor worked together six days per week.  Both Hopson and Debtor arrived at the Lakehouse around 10:00 a.m. and left around midnight.

According to Debtor, Martinez was at the Lakehouse "constantly" in July and most of August and almost every weekend after school started.[1]  Although Martinez testified she trusted Debtor to run the Lakehouse and to manage its finances in the best interests of the business, Debtor never felt like Martinez gave him "a free hand" to run the business.  She called him daily, telling him to change things back to her way of doing them.

Hopson testified about Martinez's frequent presence at the Lakehouse and the resulting friction.  She recalled that Martinez undermined Debtor to staff and frequently upset employees to the point that they wanted to quit.

Despite the problems Martinez caused, Hopson sensed that the Lakehouse was moving in a new and improved direction under Debtor's management.  Debtor improved consistency, ensuring that the restaurant remained open when it was supposed to be open.  Debtor also bought outdoor fireplaces to extend the hours the Lakehouse could serve customers.

### 1.    Martinez Questions Debtor's Cash Withdrawals

The parties dispute the purpose for and use of Debtor's cash withdrawals.  Martinez suggested Debtor withdrew funds from MarPad's business accounts for personal use.  Debtor explained that he implemented changes, requiring different cash disbursement and deposit methods.

For example, Debtor changed how the Lakehouse paid its servers.  When Martinez managed the Lakehouse, she collected and divided the tips.  If she thought fairness required distribution other than dividing tips equally, she adjusted the division of tips.  Debtor concluded that it was more efficient for the servers to collect their own tips.  According to Hopson, Debtor's change required servers to be responsible for their own "bank," and this, she said, reduced theft.  Martinez was not happy about the change even though Debtor explained that it was a better way to hold the servers accountable.

Under the new system, if a customer paid with a credit card, the transaction appeared on the sales report, and the Lakehouse paid the server cash for the charged tip.  The Lakehouse kept $1,500 in a safe for petty cash, and the cash register held $200 in cash.  Debtor periodically replenished the cash in the safe and cash register to pay servers' tips.  The more customers used credit to pay their bills, the more cash Debtor needed to pay the tips.  For example, Debtor withdrew $600 from the operating account on July 9, 2014 to replenish the safe after the holiday weekend.  He withdrew $600 on July 14, 2014 and August 28, 2014 for the same reason.

On September 8, 2014, Debtor withdrew $1,245 to pay tips for a private event.  The Lakehouse charged more than $7,000 for the event, and the contract between the

---

[1] According to Martinez, she was at the Lakehouse during the weekends until school started.  After that, she was at the Lakehouse for special events.

Lakehouse and the private party included a provision for a 20 percent tip.  Debtor withdrew the tip money before the private party paid for the event. Eight servers worked at the party, and Debtor paid the tips to the servers as provided in the contract.  He did not keep any of the $1,245.

The Lakehouse's bank inadvertently deposited the money from the event into Martinez's account instead of the Lakehouse account.  Debtor told Martinez he needed the money from the private event, but Martinez did not inform him the bank deposited the check into her account.  Instead, Debtor learned the bank deposited the money into Martinez's account after calling the bank.  Debtor was behind on payments to Martinez and Padilla-Ruezga at the time, but he was planning to use the money from the catering event to pay them.  On September 30, 2014, Martinez withdrew the $7,000 Debtor owed Martinez and Padilla-Ruezga and deposited the remainder into the Lakehouse account.

Debtor withdrew $289 on September 19, 2014, and the withdrawal slip included a notation about the safe.  Debtor testified that he withdrew funds to replenish the safe. This was the first time he noted the purpose of the withdrawal on a deposit slip because Martinez had questioned him about previous withdrawals.

Debtor withdrew $1,200 on October 6, 2014.  Debtor testified that at the end of September, the cash reserve in the safe was running low again.  He deposited the cash left in the safe at the time and withdrew $1,200 to fully replenish it with denominations that could be used as needed to pay servers' tips.

In addition to the withdrawals to replenish the safe and cash register, Debtor withdrew $803.08 on September 12, 2014 to purchase firewood and to hire a vendor to remove overgrown trees.  Debtor testified that the vendor accepted cash only.

Martinez identified several instances where the cash listed on the closing report for a given date did not correspond to the cash Debtor deposited into the Lakehouse bank account.  Martinez testified that she did not withdraw any money from the Lakehouse operating account, leaving Debtor as the only person withdrawing and depositing funds.  She did not authorize Debtor to withdraw cash from any of the Lakehouse accounts.  As discussed above, Debtor explained that the point-of-sale system caused many of the discrepancies.  Further, Debtor made batch deposits, combining the cash from several days and depositing it at one time.  This practice explains other discrepancies.

Although Debtor told Martinez he needed $600 per week for his living expenses, and the employment contract provided that he was entitled to compensation of $600 per week, Debtor testified he never withdrew any cash to pay himself and he did not otherwise "pocket" any money.  He did not use any of the withdrawn cash for personal use.  According to Debtor, Martinez assumed the money he withdrew to replenish the safe and pay tips was for his living expenses.  He did not correct her misunderstanding

because he properly accounted for the money in QuickBooks, to which Martinez had access.

## 2.    Martinez Questions Expenses

Martinez claimed that Debtor began what she characterized as "misappropriating funds" almost immediately.  Martinez monitored the bank accounts, and she notified Debtor whenever she saw a charge that she deemed inappropriate.  Her concerns about Debtor's operation of the Lakehouse began when she reviewed the July 2014 bank statement and noticed personal charges on it.  She called Debtor as soon as she saw a check for $605.15 to Staples.  Debtor explained that this expense was for a laptop, and Martinez told him he did not have authority to purchase a laptop.  Debtor reimbursed MarPad for the laptop purchase.

Martinez expressed concern about Debtor's software purchases as well.  The Lakehouse used an old version of QuickBooks, and Debtor could not open the program.  By mid-July he needed to use the program, so he purchased new QuickBooks software and split the cost of it with Seevers Auto Care, which Debtor's father owns.  On July 14, 2014, Debtor wrote a check from the Lakehouse operating account for $500 in cash.  He used the cash to pay for half the cost of the software and office supplies including printer ink, pens and tablets.  As with the laptop, Debtor reimbursed MarPad for its share of the cost for the software.  Debtor also paid $57.78 for payroll software.  Martinez claimed the Lakehouse already owned payroll software and this purchase was for Seevers Auto Care, not the Lakehouse.  Debtor denied this, asserting the fee was for the payroll portion of QuickBooks.  Martinez also asserted Debtor should not have paid $42.75 on September 25, 2014 to Microsoft.  Debtor explained that the expense related to the software on the computer in the dining room.  Microsoft no longer supported the software and the license was invalid.  This expense was necessary to operate the computer.

On July 15, 2014, Debtor issued a check for $337.96 from the Lakehouse operating account to an accounting firm.  The invoice from the firm, which the Lakehouse did not employ, shows that Debtor incurred the initial charge on November 19, 2013, and finance charges on April 10, 2014, May 9, 2014, and June 10, 2014.  Debtor acknowledged that his bookkeeper told him he needed to pay the accountants, and Debtor did not realize the payment was for past-due accounting services.  His bookkeeper gave him the Lakehouse check to pay the accountants, and he signed it.  Debtor conceded he should not have paid this expense from the Lakehouse account but claimed it was a mistake.

Martinez also questioned multiple payments to Verizon.[2]  Martinez testified that the only Verizon charge related to the Lakehouse on these bills was for the campground phone.  On the September 8, 2014 bill, the campground line cost $82.90.  Debtor

---

[2] The expenses include $160.49 on August 7, 2014, $417.89 on August 27, 2014, $417.89 on September 5, 2014 and $427.05 on October 14, 2014.

explained, however, that he used his personal cell phone for business.  The payments also included service for the tablet he used daily for the catering business and other Lakehouse business.  Martinez acknowledged speaking with Debtor about the tablet and claimed that Debtor told her he used the tablet to keep track of the campground.  Debtor also paid for his husband's phone because his husband helped operate the Lakehouse.  Although the invoice included lines unrelated to the Lakehouse or MarPad, the Lakehouse did not pay for them.  Of the $740.11 in total charges on the September 8, 2014 bill, Debtor used Lakehouse funds to pay only $417.89.  See Ex. 67.

At trial, Martinez also quibbled about Debtor paying his truck insurance expenses from the Lakehouse operating account.[3]  Debtor explained that he spoke with Martinez about the Lakehouse paying for his insurance.  He maintained that he and Martinez agreed he could pay the insurance with the Lakehouse operating funds because he used his vehicle for tasks related to the campground, catering deliveries and other business purposes.  Using his personal vehicle for work doubled the cost of his insurance and, when he told Martinez this, she agreed the expense was necessary and acceptable.  Although Martinez acknowledged talking with Debtor regarding insurance on his personal truck, she insisted she would not have agreed to allow Debtor to pay his personal expenses from the Lakehouse account.

Martinez also complained about a check Debtor wrote to Lincoln County High School Rodeo for $75.00 on July 29, 2014.  Debtor purchased an advertisement in a pamphlet that included a coupon to the Lakehouse to generate more business.  He did not inform Martinez about this expense.  Likewise, she expressed concern about a check Debtor wrote from the Lakehouse account to Trey Seevers, Debtor's brother, in the sum of $108.00 on August 1, 2014.  The Lakehouse needed a dishwasher one Saturday, and Debtor asked his brother to work.  Debtor paid him to mow the lawn and to wash dishes.  Debtor did not inform Martinez about this expense.

In early August 2014, Debtor traveled to Denver at Martinez's request to meet with her and to pick up supplies for the Lakehouse.  Debtor paid $208.63 from the Lakehouse account to stay at a Hampton Inn.  Martinez claimed this was not a legitimate Lakehouse expense because it was unnecessary for him to spend the night.  According to Debtor, Martinez wanted him to either stay with her or at a Motel 6.  Debtor drove his vehicle to Denver, and he paid for gas from the Lakehouse account.  Again, Martinez asserted there was no reason for the Lakehouse to incur this expense.

On August 21, 2014, Debtor paid $175.00 from the operating account to Twin Rivers Urgent Care.  An employee cut her index finger to the bone, and Debtor explained that it was less expensive to send her to urgent care for treatment than for her to file a worker's compensation claim.  Although Martinez acknowledged speaking with Debtor about the incident, she asserted there was no reason for the Lakehouse to incur this expense.

---

[3] The payments included $336.05 on July 14, 2014, $332.05 on August 13, 2014, and $427.05 on September 12, 2014.

Martinez also claims iTunes charges the Lakehouse paid were Debtor's personal expenses. Debtor paid $10.69 on August 22, 2014, and again on September 23, 2014 for an iTunes charge. Debtor explained that he bought an application called ScanPro to use to scan and send Martinez paperwork. He did not realize he signed up for a monthly subscription and canceled it after the second month. He did not use the application for personal purposes.

Martinez questioned several charges to gas stations.[4] Debtor testified that he did not use his Lakehouse card every time he fueled. Instead, he used the card only when he frequently drove his truck for work. For example, Debtor made two payments totaling $84.60 to Flying J that Martinez asserted did not have a business purpose. Debtor testified he filled his truck with gas and also filled a gas can for the mowers used on the Lakehouse property. He also felt justified in paying these expenses because he was not receiving a paycheck.

In late August 2014, Debtor and Hopson traveled to Lincoln to attend a food show to meet with a representative from a food supply company regarding Debtor's planned fall menu revision. Debtor paid for his hotel room and a room for Hopson from the Lakehouse account. The food company representative told Debtor the company would reimburse him for the expenses although it is unclear from the evidence whether it did. Martinez knew Debtor and Hopson were going to the food show, but she did not think it was necessary and now seeks reimbursement.

Martinez identified two charges, each for $40.00, at 201 N Dewey as unrelated to legitimate Lakehouse expenses.[5] Debtor testified that the Lakehouse's bank is located at this address and that the money was not used for personal purposes.

Martinez questioned two charges to Starbucks totaling $22.79. Debtor testified that the Starbucks purchases occurred during meetings with Martinez. Although Martinez acknowledged she and Debtor occasionally met at Starbucks, she claimed she did not meet with him on the dates of the charges. She also testified that, when she met with him at Starbucks, she paid.

Debtor paid a storage expense for two months from the Lakehouse account, which Martinez also questioned. Debtor explained that the storage expense was for two pieces of equipment from the auction that would not fit in the kitchen. He did not incur any personal storage expense.

One day in September 2014, the Lakehouse's timekeeping system was not working properly. It incorrectly accounted for the time an employee worked. The

---

[4] She questioned $76.03 to Petro on August 27, 2014; $75.00 to Timesaver on September 25, 2013 and $75.00 to Timesaver on October 2, 2014.

[5] One charge was on August 28, 2014 and the other on October 6, 2014.

employee needed to pay rent, and Debtor estimated the amount she was due and issued her a check for $200.00.  He adjusted her next paycheck to account for the payment.  Debtor did not discuss the matter with Martinez because handling payroll was among his responsibilities.

In late September 2014, a Lakehouse employee's safety glasses "got stepped on."  Debtor agreed to pay $45.00 for half of the expense of replacing them.  Again, Debtor did not think he needed to tell Martinez about this expense.

Martinez claimed that other payments Debtor made in October 2014 were unauthorized.  Specifically, Debtor paid $595.00 to a multimedia company for advertising on Facebook, Twitter and Yelp.  Lastly, the bank statements show a $216.59 VISA payment.  The Lakehouse did not have a VISA card, but neither did Debtor.  Debtor did not know about the charge, and he did not authorize it.

Other than the mistake regarding the accountant, Debtor maintained he did not use Lakehouse funds for any personal expenditures.

### 3.    Debtor's Ownership Payments and Profit and Loss Statements

The parties agree that Debtor made the July and August "owner" payments, but dispute whether he made subsequent payments.  Debtor asserts that he did not make a $7,000 payment due on September 30 because, as already discussed, the bank deposited the payment for the private party into Martinez's account and she kept the amount Debtor owed.  Debtor conceded that he made some of the payments late, but asserted that he made all of the payments except the October payment.

Debtor made the first $10,000 payment due under the purchase agreement by October 1, 2014.  Debtor did not submit profit and loss statements as required under the Employment Contract.  The Employment Contract also required Debtor to submit two percent of the Lakehouse's sales to MarPad.  According to Debtor, after he made the first two payments, Martinez inflated the payments that she claimed were due.  The Employment Contract also required Debtor to pay for the $10,000 in inventory at the Lakehouse within 60 days of the agreement, but Debtor did not make that payment.

At some point between July and October 2014, Debtor accepted a job as the director of operations for a property company.  Although the employment contract required Debtor to work for the Lakehouse full time, he took the second job to keep the Lakehouse operating.  He planned to continue operating the Lakehouse and remained committed to the business venture "for the long haul."  He also planned to apply for a loan to infuse money into the business.  With these ideas, Debtor thought "he could get through to the next season." He testified that he entered into the agreements to buy the Lakehouse as a lifetime commitment.  He wanted it to be as successful as possible.  He had planned to improve the business and hoped it would become a big business.

Hopson agreed that Debtor was trying to "make a go of it" and did not question Debtor's plans for the Lakehouse.  In fact, Hopson's long-term plan included the

possibility of entering a partnership with Debtor.  Debtor generated a lot of buzz for the Lakehouse and its catering, which is why Hopson continued working for the Lakehouse. Debtor planned to pay for the Lakehouse by catering private parties during the winter. He took the second job to ease the financial strain.

### C.      Default

During the weekend of September 13, 2014, Martinez realized that the cameras she installed to monitor activities at the Lakehouse had been disabled.  On September 17, 2014, Martinez drove to the Lakehouse to meet with Debtor, but he told her he was working on a lawsuit related to lease payments on his former bar, the Red Zone, and could not meet.  Debtor told Martinez that the profit and loss statement he mailed to her had been returned in the mail, so Martinez looked around the Lakehouse for it but did not find it.

She left a notice of default at the Lakehouse.  In the notice of default, Martinez itemized the grounds for default and informed Debtor he had seven days to cure the default.  Debtor responded to Martinez by email on September 25, 2014.  He addressed the reasons Martinez listed in the notice of default item by item.  Martinez, in turn, emailed responses to Debtor's explanations.

One source of disagreement regarded Debtor's purchase of new equipment. The Employment Contract required Debtor to seek Martinez's approval before any significant events, including the purchase of equipment.  Martinez cited equipment purchases as a basis for default because Debtor had not sought her approval.  See Doc. 89.  Debtor responded that he had not purchased equipment exceeding $250 per item.  Id.  Martinez replied that she discovered several purchases for new equipment that they had not discussed including heaters, kitchen equipment, fireplaces, a laptop, an oven and a tablet.  Id.  He spent well over $250 for each of these items.

The parties also disagreed about the information Debtor shared with Martinez. Martinez cited Debtor's failure to provide profit and loss reports, receipts and a copy of the Quickbooks file as a basis for default.  Debtor responded that Martinez had access to the server that held all of the daily numbers for the business and that he was taking steps to enable Martinez to see daily receipts.  Debtor explained that the QuickBooks software that was left in the office was out of date and he could not install it on the computer.  He also advised her that he was unable to open the copy he imported to the computer at the Lakehouse.  He promised to make paper copies and scan the reports into a folder on the desktop for Martinez.  Martinez responded that Debtor should not have purchased the laptop, tablet and software with business funds because they were unnecessary since the Lakehouse had a computer and the 2013 version of QuickBooks.

Martinez also cited Debtor's failure to contribute personal funds to cover operating expenses as needed as another basis for default.  Debtor responded:

> Because of the way the contract is setup and the fact that I have no ownership in MarPad LLC. I cannot deposit money into the operating

account unless it is deemed either a loan to the company or you [*sic*] sale of shares of MarPad LLC.  Until an addendum is made to the contract I won't be able to put money in out of my pocket.

Ex. 89.  Martinez responded that Debtor's financial contribution was a term of their agreement.

Additionally, Martinez complained that Debtor was not making timely payments. Debtor reiterated an agreement they reached when they previously spoke on the phone. They agreed that Debtor would pay $7,000 by September 30, and $1,000 per week after that date.

Martinez also claimed that Debtor was in default for adjusting his amount of compensation without discussing it with her.  Debtor responded that he had not made any adjustments.  She pointed to specific cash withdrawals.  As discussed above, Martinez misunderstood that the money Debtor was withdrawing to replenish the safe and pay tips was for his living expenses.  Although Martinez recognized at trial that their agreement provided for Debtor to be paid, Martinez testified that he was spending money on other items so it was "not her problem" if there was not enough money remaining for Debtor to take a salary.

Martinez returned to the Lakehouse the following weekend.  Debtor asked for Martinez's help creating a fall menu and setting up Christmas parties.  Martinez, Debtor and Hopson discussed revising the menu to pare it down to reduce inventory.  Martinez wanted the menu reduced to five or six items, but Debtor was convinced that customers would not come to the Lakehouse with such a limited menu.

### D.    The Fire

In the early morning of October 16, 2014, the Lakehouse started on fire and suffered significant damage.  The day after the fire, Debtor intended to fix the Lakehouse and reopen it.  He wanted to continue to run the Lakehouse, but Martinez decided to close for the season and open for private parties only.  Repairs were delayed due to the insurance company investigation and it took time to get contractors to bid on projects and complete the work.  Martinez knew the Lakehouse could not reopen without significant investment by Debtor.

The Lakehouse had booked a private party scheduled to take place the day after the fire, but Martinez immediately canceled it.  The event would have earned $6,500, and the Lakehouse had already incurred the costs of food for it.  Even before the fire, Debtor knew that October would be a bad month, but he was relying on the money the event would have generated.  He knew that "it'd get thin," but Debtor had booked more than a dozen upcoming private events, including a wedding for almost $15,000. Martinez immediately canceled them all.

Payroll was due to be paid the Friday after the fire, but Martinez was not able to access the computer system.  Debtor told her Seevers Auto owned the software, and

she requested the QuickBooks documents from him.  Debtor asked his bookkeeper to prepare a statement which he gave to Martinez.  According to the statement, as of October 16, 2014, the Lakehouse owed $28,527.58 for accounts payable and payroll.  Martinez was "floored."[6]  Martinez testified that, at the time of the fire, there were "NSF checks on all accounts."  She knew she needed to pay the employees, but there was no money in the payroll account.

Martinez changed the locks to the Lakehouse immediately after the fire.  Initially, she did not give Debtor keys to the new locks.  Martinez told him she was not comfortable with him and planned to close the business. Ultimately, however, Martinez gave Debtor keys.  Only Debtor, Martinez and Martinez's brother, Matt, had keys immediately after the fire.

Immediately after the fire, Martinez also took pictures of the Lakehouse.  A few days later, she noticed empty slots where liquor bottles had been stored.  After determining what was missing, she looked at invoices for the costs of the missing liquor and calculated that approximately $1,000 in liquor was missing.

Shortly after the fire, Martinez watched the recordings from the cameras and observed Debtor making two late-night visits to the Lakehouse to remove items.  In addition to the liquor, Martinez claimed Debtor took fireplaces, kitchen equipment and the laptop.  An infrared heater, propane tanks and outdoor heaters were also missing.  Matt Martinez testified that some of the items he saw immediately after the fire were later missing, including the fireplace, propane tanks and a smoker.  According to Hopson, however, the smoker was in the shed after the fire.  Hopson took a picture of the smoker and gave the picture to both Martinez and the insurance adjustor.

Martinez offered receipts from several area stores to show the cost of the items she claimed were missing after the fire.  The receipts show four propane tanks cost a total of $192.56.  Martinez claimed the propane tanks were at the Lakehouse immediately after the fire but not a few days later.  The receipts also show a USB cable, copy paper and a printer cost a total of $103.19.  Although she did not see Debtor remove these items on camera, Martinez testified that these items were not at the Lakehouse after the fire.  Other items allegedly missing from the Lakehouse included a beaded adding pad and six jump drives that cost a total of $45.46.  Martinez opined that these purchases were wasteful because the supplies were not necessary but, in any event, they were not at the Lakehouse after the fire.  Other allegedly missing items included a trailer hitch that cost $24.60, a fireplace that cost $299.98, four patio heaters that cost a total of $596.00, another heater that cost $119.00, a cooler that cost $69.98 and a roof carrier that cost $19.91.

---

[6] Martinez did not have the full picture of the Lakehouse's financial situation until she sued Debtor in state court and eventually obtained all of the information.

Further, Martinez did not recall seeing all of the items listed on the auction invoices at the Lakehouse after the fire. Some of them were lost in the fire, but Martinez claims Debtor removed other items from the Lakehouse.

Debtor admitted that he took certain items from the Lakehouse after the fire. He claimed, however, that the only liquor bottles he took were bottles he had brought to the Lakehouse from his previous bar. The bottles had been deemed non-sellable and were all marked as not-for-customer sale. When asked why he took the liquor in the middle of the night, Debtor explained that he thought it was the best, nonconfrontational way to handle the situation.

Aside from the liquor, the only items Debtor admitted he took were one fireplace and one heater. He said that he felt he contributed money to the Lakehouse but received no money from it so he felt justified in taking the fireplace and heater. The other heaters Martinez claimed were missing were near the shed that started on fire and were destroyed.

After Martinez saw the videos of Debtor removing items from the Lakehouse, she changed the locks again and terminated Debtor's employment. Martinez closed the Lakehouse because it had no money or employees, it owed outstanding debt and it needed repairs.

After the fire, various vendors sent invoices seeking payment. Martinez paid all the vendors that pursued payment, but several vendors stopped pursuing payment. The sum that Martinez paid on vendor invoices for charges incurred while Debtor was responsible for operating the Lakehouse totaled $6,696.36.

### E. Unpaid Wages and Taxes

#### 1. Wages

Martinez paid a total of $4,069.70 in wages that she claims Debtor should have paid. On October 31, 2014, the Nebraska Department of Labor sent Martinez an email message regarding complaints filed by three employees for unpaid wages. Martinez paid claims in the sums of $21.00, $660.00 and $165.00. On November 12, 2014, the Department of Labor sent Martinez another email regarding two wage complaints from employees. All of the unpaid wages were from the week before the fire, and the employees should have been issued checks the day after the fire. Martinez paid $250 for each employee. Lastly, on January 27, 2016, an investigator from the Department of Labor sent Martinez a letter regarding unpaid wages for Hopson from July and October 2014. Martinez paid Hopson the wages Hopson claimed she was owed, $2,765.98.[7]

---

[7] With regard to the July wages, Hopson testified that when she received the paycheck at the time, she did not have an opportunity to cash a check immediately because she was working every day. She put the check in her car but then could not find it. She eventually found the check under the visor and cashed it that week.

## 2.   Taxes

Martinez paid all taxes through July 1, 2014, when Debtor took over operations. The Nebraska Department of Revenue sent MarPad a bill for October 2014 for $25.01. On November 6, 2014, the State of Nebraska Treasurer sent MarPad a bill for $119.25 for a child support payment for one of the Lakehouse's employees that was returned by MarPad's bank.  The date on the payment was after Debtor's termination.

Martinez also paid:

- $1,461.50 for sales and use taxes incurred in September and October 2014;
- $2,250.57 for wage withholding taxes for the third and fourth quarters of 2014;
- $1,766.29 for unemployment taxes for the third and fourth quarters of 2014;
- $13,057.42 for federal taxes for the third and fourth quarters of 2014.

Debtor did not know about many of these obligations.  According to Debtor, he never missed a tax or insurance payment during his management of the Lakehouse and he kept all of the Lakehouse's obligations current through the date of the fire.  By the time any other obligations were due after the fire, he was no longer employed by the Lakehouse and had no control over the Lakehouse's accounts because Martinez removed him from the accounts by 11:00 a.m. the day after the fire.  He wrote checks for expenses after the fire, but they were returned as issued by a non-authorized signor.

On December 11, 2015, Debtor filed a voluntary petition for bankruptcy relief under Chapter 7 of the Bankruptcy Code.

## F.   Alleged Damages

MarPad seeks damages in the sum of $62,044.83.  Doc. 108 at 18.  This sum includes:

- $20,975.53 for unpaid taxes and tax penalties for late payments.  This calculation includes state and federal taxes that were not paid by [Debtor], despite the fact that he informed Plaintiffs that they had been paid.  Plaintiffs repeatedly asked for updated financial reports evidencing payment of theses [*sic*] obligations and [Debtor] refused to provide the information.  Plaintiffs did not receive the necessary information to handle these obligations until they filed a replevin action in County Court of Lincoln County, Nebraska to obtain documentation. At that time, late fees had been assessed.  In addition, funds that should have been used to pay the obligation were used by [Debtor] for his own personal gain.

- $4,069.70 for payroll claims made against Plaintiffs that should have been paid by [Debtor].

- $6,696.35 for unpaid vendor bills. These bills were incurred by [Debtor], but were not paid by him. Instead he used MarPad funds for his personal gain and depleted the assets of Plaintiffs so there were not sufficient funds to pay these vendors.

- $5,663.00 for automatic transfers to cover bad checks written by [Debtor.]

- $3,745.98 for inventory payments not made pursuant to obligations under the Agreements.

- $3,116.54 for owner payments not made pursuant to the Agreements.

- $906.98 for stolen liquor. This liquor was purchased using MarPad funds, but was used by [Debtor] for his own personal gain.

- $10,849.85 for personal use of funds. These funds were MarPad funds that were used by [Debtor] for his own personal gain.

- $5,305.94 for stolen property. This property was purchased by MarPad and was removed by [Debtor] for his own personal gain.

Doc. 103 at 11. These items total $61,329.87. In their closing brief, Plaintiffs' explain that this total differs from the $62,044.83 they actually claim due to a calculation error. Doc. 108 at 18. Plaintiffs itemize their damages claim by listing the expenses for which they seek reimbursement with reference to supporting documentation in their closing brief. Doc. 108 at 12-18.

## II.    CONCLUSIONS OF LAW

Plaintiffs argue the Court should deny Debtor his bankruptcy discharge under section 727 or, alternatively, the Court should deny Debtor a discharge of his debt to Plaintiffs under section 523.

### A.    11 U.S.C. § 727(a)

Plaintiffs seek a denial of Debtor's discharge under 11 U.S.C. § 727(a)(2). Section 727(a) of the Bankruptcy Code provides that the court shall grant a debtor a discharge unless:

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under [the Bankruptcy Code], has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing
of the petition[.]

11 U.S.C. § 727(a).

Denying a debtor a discharge is a harsh remedy.  Home Serv. Oil Co. v. Cecil (In
re Cecil), 542 B.R. 447, 451 (B.A.P. 8th Cir. 2015) (citation omitted).  Therefore, courts
construe section 727 strictly in favor of the debtor.  Id.  Notwithstanding, a discharge in
bankruptcy and the associated fresh start are privileges, not rights.  Bauer v. Iannacone
(In re Bauer), 298 B.R. 353, 357 (B.A.P. 8th Cir. 2003) (citing Grogan v. Garner, 498
U.S. 279, 286 (1991)).  "The opportunity for a completely unencumbered new beginning
is limited to the honest but unfortunate debtor." Id.  The cost to the debtor for an
unencumbered fresh start is minimal, but it includes honestly and accurately disclosing
his or her financial affairs and cooperating with the trustee.  Id.; see also 11 U.S.C.
§ 521 (listing a debtor's duties in bankruptcy).

To prevail under section 727(a)(2)(A), Plaintiffs must prove: (1) the act serving as
the basis for the claim took place within one year before the petition date; (2) the act
was that of Debtor; (3) the act amounted to a transfer, removal, destruction, mutilation
or concealment of Debtor's property; and (4) Debtor committed the act with an intent to
hinder, delay or defraud a creditor or the trustee.  See City Nat'l Bank of Ft. Smith v.
Bateman, 646 F.2d 1220, 1222 (8th Cir. 1981); Georgen-Running v. Grimlie (In re
Grimlie), 439 B.R. 710, 716 n.11 (B.A.P. 8th Cir. 2010); Sears v. Sears, 542 B.R. 463,
474 (D. Neb. 2015).  "[T]he objecting party must prove each element under § 727 by a
preponderance of the evidence."  Kaler v. Charles (In re Charles), 474 B.R. 680, 683–
84 (B.A.P. 8th Cir. 2012) (citing Allred v. Vilhauer (In re Vilhauer), 458 B.R. 511, 514
(B.A.P. 8th Cir. 2011); Fed. R. Bankr. P. 4005).  To meet this standard, the Court must
believe the existence of a fact is more probable than its nonexistence.  Northland Nat'l
Bank v. Lindsey (In re Lindsey), 443 B.R. 808, 812 (B.A.P. 8th Cir. 2011).

Plaintiffs assert Debtor "failed to include assets on his Bankruptcy schedules or
concealed these assets with regard to his Bankruptcy filing."  Doc. 108 at 2-3.  They
allege Debtor removed multiple items including a fireplace, patio heaters, coolers and
electronics from the Lakehouse for his personal use.  Debtor admitted removing a
fireplace and outdoor heater because he felt he "earned" them.  Because Debtor
"willfully and maliciously defrauded the estate and failed to disclose assets" in his
bankruptcy schedules, Plaintiffs argue he should be denied a discharge under section
727.  Doc. 108 at 3.

Plaintiffs' section 727 cause of action fails for two reasons.  First, Plaintiffs did not
show that Debtor transferred, removed, destroyed or concealed property that he owned.
The only evidence Plaintiffs offer in support of their section 727 cause of action is
Martinez's testimony that Debtor removed these items from the Lakehouse.  They did
not question Debtor or offer other evidence that, within one year of the petition date,
Debtor owned the fireplace and heater or ever possessed or owned the coolers and
electronics.  Likewise, they did not inquire about whether the $610 in household goods
and furnishings Debtor listed on his schedules included these items.  See Bankr. No.

15-41941, Doc. 11 at p. 4.  The fireplace, heaters, electronics and coolers might be among the property in this category and, therefore, properly disclosed.  It is also possible that Debtor no longer owned (or ever owned) these items when he filed for bankruptcy relief.  Therefore, Plaintiffs failed to prove the third element of their section 727(a)(2)(A) claim:  the act amounted to a transfer, removal, destruction, mutilation or concealment of Debtor's property.

Second, Plaintiffs' cause of action under section 727 is untimely.  In their Complaint, Plaintiffs allege that "in September and October 2014, it came to Plaintiffs' attention that Nick Seevers was removing personal property and inventory belonging to Plaintiffs from the Lakehouse property for his own use."  Compl. at ¶ 14.  At trial, Martinez testified that Debtor allegedly removed items from the Lakehouse in October 2014 or before.  Debtor petitioned for bankruptcy relief on December 11, 2015, more than one year after the conduct giving rise to Plaintiffs' cause of action under section 727(a)(2)(A).  Thus, Plaintiffs failed to show the first element of their claim, i.e., that the act serving as the basis for the claim took place within one year before the petition date.

In summary, Plaintiffs failed to meet their burden of proving that Debtor transferred, removed, destructed, mutilated or concealed property within one year of the petition.  Their claim under section 727(a)(2) is dismissed.

## B.    11 U.S.C. § 523

Plaintiffs seek a determination that Debtor's debt to them is excepted from discharge under 11 U.S.C. § 523(a)(2)(A), (a)(4) and (a)(6).  Section 523 provides that the Bankruptcy Code does not discharge a debtor from any debt:

> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by—
>
> > (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;
>
> > * * *
>
> (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;
>
> > * * *
>
> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

11 U.S.C. § 523(a).  Plaintiffs must prove each element of a section 523 claim by a preponderance of the evidence.  In re Lindsey, 443 B.R. at 812 (citing Grogan, 498 U.S. at 286–91).  Exceptions to discharge are narrowly construed to effectuate the "fresh

start" of the Bankruptcy Code.  Cmty. Fin. Grp., Inc. v. Fields (In re Fields), 510 B.R. 227, 233 (B.A.P. 8th Cir. 2014) (citation omitted).

### 1.    False Representation

Plaintiffs assert Debtor made multiple misrepresentations with the intent to deceive them, and the Court should except Debtor's debt to them from discharge under section 523(a)(2)(A).

Section 523(a) of the Bankruptcy Code excepts certain debts from discharge in bankruptcy, including debts for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation or actual fraud. 11 U.S.C. § 523(a)(2)(A).  Plaintiffs must prove each of the following elements to establish nondischargeability of a debt obtained by a false representation under section 523(a)(2)(A):[8] (1) the debtor made a representation, (2) with knowledge of its falsity, (3) deliberately for the purpose of deceiving the creditor, (4) who justifiably relied on the representation, which (5) proximately caused the creditor damage. Heide v. Juve (In re Juve), 761 F.3d 847, 851 (8th Cir. 2014) (citing Treadwell v. Glenstone Lodge, Inc. (In re Treadwell), 637 F.3d 855, 860 (8th Cir. 2011)); Hasley v. Irons (In re Irons), 2017 WL 943897, at *2 (Bankr. D. Neb. Mar. 9, 2017).

### a.    The debtor made representations

Plaintiffs claim that, at the time Debtor entered into the purchase agreement and employment agreement, he represented that he had the intention and ability to purchase all of the shares of MarPad.[9]  Debtor also represented to MarPad that he

---

[8] Although Plaintiffs included false representation and actual fraud as grounds for the section 523(a)(2)(A) cause of action in their Complaint, their trial brief and closing brief focus exclusively on false representations.  Consequently, the Court will focus its analysis on this claim.

Even if Plaintiffs had argued actual fraud or suggested Debtor employed a fraud scheme, the Court finds that the evidence received at trial does not support such a claim.

[9] To the extent Plaintiffs assert Debtor misrepresented that he had the financial ability to purchase the Lakehouse, this alleged misrepresentation is not actionable under section 523(a)(2)(A) because it relates to Debtor's financial condition.  See 11 U.S.C. § 523(a)(2); First Nat. Bank of Olathe, Kan. v. Pontow, 111 F.3d 604, 608 (8th Cir. 1997) (quoting Barclays Am./Bus. Credit, Inc. v. Long (In re Long), 774 F.2d 875, 877 n.1 (8th Cir. 1985) ("Since subsection (B) covers only statements 'respecting a debtor's . . . financial condition' and subsection (A) excludes such statements, the subdivisions 'are . . . expressly mutually exclusive.'")); Premier Bank v. Poole (In re Poole), 2016 WL 74276, at *1 (Bankr. D. Neb. Jan. 6, 2016) ("Because the allegations

would act as an employee with control of accounts and responsibility to maintain accounts, pay taxes and invoices, and act in the best interests of the Lakehouse and MarPad until he completed the purchase of the shares of MarPad.  Plaintiffs assert Debtor continued to provide Martinez with explanations and representations throughout the time MarPad employed him.[10]

Debtor does not dispute that he made the representations and promises included in the Agreement for Purchase and Sale of Membership Units and Employment Contract, and the Court finds that Debtor made the representations included in these agreements.

b.  <u>Knowledge the representation was false</u>

Plaintiffs assert Debtor knew his representations were false when he made them. Specifically, they claim Debtor failed to make the required payments under the purchase agreement and began misappropriating funds and assets for personal use almost immediately after entering into the purchase and employment agreements.  They assert that Debtor did not actually have the funds or ability to purchase the shares in MarPad at the time he entered into the agreements and that he continued to make false representations to maintain his access to Lakehouse funds.  Plaintiffs also assert that Martinez inquired about whether Debtor made tax and vendor payments and Debtor told her that he made these payments.  Plaintiffs claim the evidence at trial establishes that Debtor was not making these payments.

As an example of Debtor's alleged misappropriation of funds and related misrepresentations, Plaintiffs cite Debtor's statement in his email response to the "notice of default" Martinez left on Debtor's desk on September 17, 2014.  Doc. 89. Referencing paragraph 3.2 of the Employment Contract which requires Martinez's approval of "significant" projects including the purchase of new equipment, Debtor represented that he made no equipment purchase exceeding $250 per item.  <u>Id.</u>

---

in this case appear to deal with a written financial statement, § 523(a)(2)(B) is the applicable provision.").

[10] In addition to the specific representations listed in this paragraph, Plaintiffs claim Debtor made numerous other misrepresentations.  They argue:  "The list of false representations made by [Debtor] is too lengthy to address in this brief, but it is clear, based on the testimony and exhibits, that they were numerous."  Doc. 108 at 5. Plaintiffs carry the burden of proving each element of their claim.  Accordingly, they must direct the Court to the representations they claim Debtor knew were false and made with intent to deceive.  The Court reviewed the testimony and other evidence to determine whether statements or conduct support the alleged misrepresentations specifically listed by Plaintiffs but declines to treat each and every statement Martinez claims Debtor made during the course of the trial as an alleged misrepresentation under section 523(a)(2)(A) or to speculate about which statements Plaintiffs claim support this cause of action.

Plaintiffs argue bank statements, receipts and testimony demonstrate that Debtor knowingly purchased six items between July 10, 2014 and September 10, 2014, spending more than $600 on each purchase.

Plaintiffs also claim Debtor misappropriated funds by traveling to Denver to meet with Martinez and pick up supplies for the Lakehouse. Debtor used Lakehouse funds to pay for his gasoline and hotel. Martinez claims these expenses were unnecessary and that his initial explanation regarding the purpose of the trip was inconsistent with his testimony at trial.

The Court finds that Debtor's email explaining that he had not purchased equipment in excess of $250 was false. Given the availability of bank statements and accounting records, it is apparent that Debtor knew or should have known this statement was false.

Plaintiffs did not show, by a preponderance of the evidence, that Debtor knew the other representations listed by Plaintiffs were false when he made them. For example, the evidence received at trial does not show that Debtor knew his statements regarding his expenses for the trip to Denver were false or that his decision to pay these expenses from Lakehouse funds was a misappropriation of funds. The Court received conflicting testimony from Martinez and Debtor and finds Debtor's explanation credible.

Plaintiffs also failed to show that Debtor's representations regarding his intention and ability to purchase MarPad's shares were false. Debtor testified that he viewed the agreement to buy the Lakehouse as a lifetime commitment. He wanted the Lakehouse to be as successful as possible and planned to improve and grow the business. He devoted his time and energy to upgrading the restaurant and improving operations. His failure to make timely payments or other evidence that he breached certain provisions of the parties' agreements, without more, does not show that he made false representations regarding his intent or ability to buy MarPad shares. At most, this evidence shows that Debtor underestimated how difficult it would be to operate the business and/or overestimated the profits he would realize from the business. Plaintiffs offered no evidence that Debtor knew he could not pay his debt when he signed the employment and purchase agreements, and the Court found none.

Similarly, Plaintiffs failed to show that Debtor made false representations regarding tax and vendor payments. The Court received evidence that Plaintiffs paid taxes and vendors after the Lakehouse fire. The fact that Plaintiffs incurred and paid debts arising from the Lakehouse tax and vendor obligations does not show Debtor made false representations regarding these debts. The large majority of these debts became due and payable after the October 16, 2014 fire. Debtor testified that he did not know about many of these obligations. During his management of the Lakehouse, he never missed a tax or insurance payment and kept all of the Lakehouse's obligations current through October 16, 2014. By the time the other obligations were due after the fire, he was no longer employed by the Lakehouse and had no control over the Lakehouse's accounts because Martinez removed him from the accounts by 11:00 am

the day after the fire.  He wrote checks for expenses after the fire, but they were returned as issued by a non-authorized signor.  Debtor's inability to access the Lakehouse accounts and make payments after the fire were the consequence of Martinez's decision to cease operations and terminate Debtor's employment.

Plaintiffs argue that "when Ms. Martinez continuously inquired about taxes and vendor payments, Mr. Seevers informed her that these obligations were taken care of." The Court received no evidence of a specific circumstance when Martinez asked about a pre-fire debt and Debtor falsely represented it was paid.  To the contrary, Debtor testified that Lakehouse vendor and tax obligations were current before the fire. Debtor's failure to communicate with Martinez or send MarPad the financial reports required by the Employment Contract, without more, does not establish that Debtor made representations he knew were false.  At most, this evidence shows that Debtor failed to comply with his obligations under the parties' agreements.  A breach of a promise is not the equivalent of a false representation.  Plaintiffs did not offer evidence sufficient to show Debtor's pre-fire statements to Martinez about "taking care of" tax and vendor obligations were false.

Finally, Plaintiffs' allegations regarding Debtor's alleged misappropriation of funds do not support their cause of action under 523(a)(2)(A).  The greater weight of evidence does not support Plaintiffs' characterization that Debtor was misappropriating funds and making false statements to hide the alleged misappropriations.  Debtor exercised a level of autonomy consistent with his prior management experiences, and the expenses he paid from the Lakehouse account were reasonable and satisfactorily explained.

c.    <u>Intent to deceive</u>

To meet the third element of their claim under section 523(a)(2)(A), Plaintiffs must show that Debtor "acted with the subjective intent to deceive the creditor."  <u>Phillips 66 Co. v. Miltenberger</u>, (<u>In re Miltenberger</u>), 531 B.R. 228, 235 (Bankr. W.D. Mo. 2015) (quotation omitted).

> Subjective intent is often based on circumstantial evidence because a debtor rarely admits to fraudulent intent. <u>See, e.g.</u>, <u>In re Treadwell</u>, 637 F.3d 855, 863 (8th Cir. 2011) (imputed fraud determination turned on "disputed facts, credibility determinations, and the inferences a fact finder may choose to draw therefrom."). To find fraudulent intent based on circumstantial evidence, the court considers whether "the totality of the circumstances 'presents a picture of deceptive conduct by the debtor which indicates intent to deceive the creditor.'" <u>In re Davis</u>, 246 B.R. 646, 652 (10th Cir. BAP 2000), aff'd in part, vacated in part on other grounds (citations omitted).

<u>Id.</u>

Plaintiffs claim the only reason Debtor made the alleged false statements was to deceive Martinez and to buy more time to use MarPad's funds to eventually come up

with a plan to purchase the Lakehouse.  It asserts Debtor's false representations were his way of placating Martinez to allow him to continue to operate without actually fulfilling his obligations under the terms of their agreements.

The totality of circumstances of this case does not present a picture of deceptive conduct suggesting Debtor intended to deceive Plaintiffs.  Rather, Debtor's testimony and conduct demonstrated that he intended to fulfill his contractual obligations and to make the Lakehouse a success.[11]  The Court finds his testimony credible.  Debtor persevered despite Martinez's second guessing and micromanagement of nearly every operational decision he made.  Martinez did not support Debtor's systematic, technological or logistical improvements, and she actively hindered his prospects for success in many ways, including taking many Lakehouse assets on the eve of the transition to Debtor's management and undermining him to employees.  Plaintiffs failed to prove that Debtor made false representations with the intent to deceive Plaintiffs.

d.    Proximate Cause

Plaintiffs did not meet their burden of showing that Debtor's allegedly fraudulent representations proximately caused the damages they allege comprise Debtor's debt to them.  The wage and withholding claims, taxes, utilities, insurance, banking fees, vendor supplies and services debts and the Nebraska Public Health Lab Fee were legitimate debts the Lakehouse/MarPad owed its creditors.  Debtor's failure to timely pay these debts may be sufficient to show a breach of the Employment Contract, but this conduct is not sufficient to show that these debts were obtained by false representations or resulted from Debtor's alleged misrepresentations.

Likewise, the damages Plaintiffs claim arose from Debtor allegedly withdrawing cash or using funds from a MarPad bank account for nonbusiness purposes and removing items from the Lakehouse after the fire were not proximately caused by false representations.[12]  Debtor credibly explained the reasons for the cash withdrawals and the variation in cash deposits.  The Court found no evidence that, before the fire, Debtor intentionally depleted Plaintiffs' assets for personal gain.  As for removing Lakehouse property after the fire, the Employment Contract granted Debtor access to MarPad

---

[11] Plaintiffs offered evidence sufficient to show Debtor made one false representation.  In his email responding to the Notice of Default, Debtor represented that he did not purchase equipment exceeding the sum of $250 per item, when receipts show he purchased six items in excess of $250 each.  See Doc. 89.  Plaintiffs did not establish that Debtor made this representation with intent to deceive or misappropriate MarPad funds.  Debtor satisfactorily explained his reasons for purchasing the items and demonstrated that he purchased these items with intent to improve operations and attract more customers.  While Plaintiffs may have established that Debtor's answer was not correct, the Court is not convinced that Debtor intended to deceive plaintiffs.

[12] Plaintiffs claim for damages arising from Debtor's removal of items from the Lakehouse are further addressed under other causes of action analyzed below.

24

property and, with limitations, authority to acquire and dispose of property.  To the extent his conduct was not authorized by the Employment Contract, Plaintiffs may have grounds to pursue other causes of action, but the evidence does not show that Debtor obtained any of this property by false representations.

Finally, Debtor's unpaid installment payments under the Agreement for Purchase and Sale of Membership Units were not obtained by a false representation.  The Court found no evidence that Debtor fraudulently induced Martinez and Padilla-Ruezga to enter into the Agreement for Purchase and Sale of Membership Units or MarPad to enter into the Employment Contract.  Rather, the Court finds that the parties were on equal footing and executed the contracts voluntarily and with intention to perform.  Accordingly, any damages arising from failure to perform under these agreements may be the result of a breach of contract, but they are not proximately caused by fraudulent representations.  Plaintiffs' cause of action under section 523(a)(2)(A) fails.  Given that Plaintiffs failed to meet some of the elements noted above, the Court need not analyze justifiable reliance.

## 2.    Fraud or Defalcation While Acting in a Fiduciary Capacity

Plaintiffs assert Debtor's actions constitute fraud or defalcation while acting in a fiduciary capacity and request the Court to except Debtor's debts to them from discharge under section 523(a)(4).[13]

To prevail on their section 523(a)(4) cause of action, Plaintiffs must establish that (1) a fiduciary relationship existed between Plaintiffs and Debtor and (2) Debtor committed fraud or defalcation in the course of that fiduciary relationship.  See In re Irons, 2017 WL 943897, at *4 (citing Jafarpour v. Shahrokhi (In re Shahrokhi), 266 B.R. 702, 707 (B.A.P. 8th Cir. 2001).  Whether a relationship is a fiduciary relationship under section 523(a)(4) is a question of federal law.  Arvest Mortg. Co. v. Nail (In re Nail), 680 F.3d 1036, 1039 (8th Cir. 2012) (citing Tudor Oaks Ltd. P'ship v. Cochrane (In re Cochrane), 124 F.3d 978, 984 (8th Cir. 1997)).  The fiduciary relationship required under this section is more narrowly defined than that under the general common law.  In re Shahrokhi, 266 B.R. at 707.  "[T]he broad, general definition of fiduciary—a relationship involving confidence, trust and good faith—is inapplicable in the dischargeability context."  Reshetar Sys., Inc. v. Thompson (In re Thompson), 458 B.R. 504, 508 (B.A.P. 8th Cir. 2011) (quotation omitted).

---

[13] Although Plaintiffs recite the full version of section 523(a)(4) in their Complaint, they did not argue that Debtor's debt to them should be excepted from discharge because they established embezzlement or larceny.  In their trial brief and closing brief, they focus exclusively on defalcation while acting in a fiduciary capacity.  Consequently, the Court will analyze this claim only.

"Acting in a fiduciary capacity" is limited in application to technical or express trusts, not to trusts that may be imposed because of the alleged act of wrongdoing from which the underlying indebtedness arose. See Hunter v. Philpott, 373 F.3d 873 (8th Cir. 2004) ("fiduciary" used in a strict and narrow sense in § 523(a)(4), and fiduciary status must pre-date the debt); Barclays Am./Bus. Credit, Inc. v. Long (In re Long), 774 F.2d 875, 878–79 (8th Cir. 1985) (holding that for purposes of § 523(a)(4) fraud or defalcation exception, fiduciary capacity must arise from express trust, not constructive trust or mere contractual relationship). The substance of a transaction, rather than the labels assigned by the parties, determines whether there is a fiduciary relationship for bankruptcy purposes. Nail, 680 F.3d at 1040 (quoting Long, 774 F.2d at 878–79).

In re Irons, 2017 WL 943897, at *4.

"A technical trust is one imposed by statute or common law." Aslakson v. Freese (In re Freese), 472 B.R. 907, 923 (Bankr. D.N.D. 2012) (footnote omitted). Plaintiffs do not assert the existence of a technical trust, and the Court finds that no technical trust existed in this case.

"An express trust is created by a direct, positive, and objectively-manifested act under contract, or under an instrument such as a deed or will." Id. (quotation omitted). "Typically, the parties to an express trust prepare a declaration of a trust, define a trust res and outline specific duties and responsibilities of the trustee." Id. (footnote omitted).

Citing Pelstar Dev., LLC v. Pelshaw (In re Pelshaw), Plaintiffs allege the employment contract created a trust and imposed a fiduciary duty on Debtor to manage trust assets for the benefit of MarPad. 2013 WL 1103285 (Bankr. D. Neb. Mar. 15, 2013). In In re Pelshaw, the debtor was the manager and 50% owner of an LLC. Id. at *1. Plaintiffs correctly state that the bankruptcy court found that the debtor, as a manager, owed a fiduciary duty to the members of the LLC to act for the benefit of the LLC. See id. at *2. However, Plaintiffs fail to acknowledge the significant fact that the debtor in In re Pelshaw admitted in his answer that he was acting in a fiduciary capacity, and therefore, the court did not analyze the issue. Id. Debtor made no such admission in this case.

Plaintiffs attempt to distinguish this case from In re Freese. The court in In re Freese determined that a fiduciary relationship did not arise from a partnership agreement. 472 B.R. at 924. The court explained that "[t]he Partnership Agreement did not include a provision requiring that Debtor hold sale proceeds in trust or immediately remit the proceeds from the sale of vehicles to the bank." Id. The agreement in In re Freese "not only granted the Managing Partner a great deal of discretion, it gave him the benefit of the doubt regarding the exercise of this discretion." Id. Plaintiffs claim that the employment contract in this case is much more specific regarding Debtor's responsibilities for handling proceeds and accounts. They assert the contract provided that Debtor was to use the business operating account to procure inventory and to pay

utilities and general operating expenses, but Debtor made payments from the account that exceeded the allowed disbursements under the contact.  Although Plaintiffs argue these distinctions render In re Freese inapplicable in this case, the Court disagrees. Doc. 103.  The Employment Contract in this case, like the partnership agreement in In re Freese, does not impose an express trust.  See 472 B.R. at 924.

In general, an employment relationship is not sufficient to establish a fiduciary relationship under section 523(a)(4).[14]  In this case, the parties outlined the terms of their agreement in the Employment Contract.  Although the employment contract listed Debtor's duties and responsibilities—including maintaining accounts, managing assets and inventory and providing a detailed monthly accounting—these duties and responsibilities do not create a trust. The parties did not clearly express their intention to create a trust or define a trust res.  Rather, they defined the expectations of their employment relationship in the context of a membership purchase agreement.  It appears that the parties included a great deal of detail regarding the establishment of accounts in the Employment Contract because they expected that Martinez would not be at the Lakehouse on a day-to-day basis to oversee operations and she wanted to ensure mechanisms were in place to allow her to oversee Debtor's work and collect ownership payments while she was away.  The parties did not testify about the creation of a trust or the expectation that Debtor would serve as trustee for MarPad, and the nature of their relationship did not suggest that they intended to create a trust.  Instead, they treated their relationship as a standard employer/employee relationship with an anticipated buyout agreement.

Because Plaintiffs did not establish that the Employment Contract created an express or technical trust, the relationship between MarPad and Debtor was merely contractual, not fiduciary.  Although Debtor may have breached the employment

---

[14] See Fed. Ins. Co. v. Sorge (In re Sorge), 566 B.R. 369, 377 (Bankr. E.D.N.C. 2017) ("A mere employment relationship is not enough to establish a fiduciary capacity for purposes of § 523(A)(4)."); Lacourse Builders, LLC v. D'Anello (In re D'Anello), 477 B.R. 13, 26-27 (Bankr. D. Mass. 2012) (manager of construction company, while subject to fiduciary duties of loyalty and care, did not hold a position of "substantial ascendancy" over the company and is thus not a fiduciary for purposes of § 523(a)(4)); Control Module, Inc. v. Dybowski (In re Dybowski), 2012 WL 1945503, at *12 (Bankr. D. Conn. May 30, 2012) (observing that while courts generally agree that officers and directors may be fiduciaries to a corporation, there is no similar agreement where it concerns mere employees); Grow Up Japan, Inc. v. Yoshida (In re Yoshida), 435 B.R. 102, 109 (Bankr. E.D.N.Y. 2010) (neither an employment relationship alone nor elevating an employee to a managerial position gives rise to a fiduciary relationship for purposes of § 523(a)(4)); Shearson Lehman Hutton Mortg. Corp. v. Gierman (In re Gierman), 106 B.R. 733, 737 (M.D. Fla.1989) (finding that a bank loan officer is not a fiduciary within the meaning of section 523(a)(4) notwithstanding an employment contract); Novartis Corp. v. Luppino (In re Luppino), 221 B.R. 693, 698–99 (Bankr. S.D.N.Y. 1998) (management level employee not a fiduciary under section 523(a)(4)).

agreement with MarPad, he was not acting in a fiduciary capacity during the term of this contract.  Accordingly, Plaintiffs' claim under section 523(a)(4) fails.

### 3.    Willful and Malicious Injury

Plaintiffs claim Debtor willfully and maliciously used, or failed to use, funds belonging to MarPad in a manner that caused substantial damage to Plaintiffs.  Doc. 103 at 10.  They seek a determination that his debt to them is excepted from discharge under section 523(a)(6).

Section 523(a)(6) excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6).  Section 523(a)(6) first requires the court to determine "exactly what 'injury' the debt is 'for.'" Blocker v. Patch (In re Patch), 526 F.3d 1176, 1181 (8th Cir. 2008). Next, the court must determine whether the debtor both willfully and maliciously caused the injury. Id.  "It is well established in the Eighth Circuit that the elements of 'malice' and 'willfulness' must be separately analyzed." Sailor Music v. Walker (In re Walker), 514 B.R. 585, 589 (B.A.P. 8th Cir. 2014) (citations omitted). The party seeking to avoid the discharge of the debt bears the burden of proving, by a preponderance of the evidence, that the section 523(a)(6) exception to discharge applies. Hidy v. Bullard (In re Bullard), 449 B.R. 379, 384 (B.A.P. 8th Cir. 2011) (citation omitted).  Thus, Plaintiffs must prove an injury occurred and that it was "willful" and "malicious" by a preponderance of the evidence.

Plaintiffs allege they incurred debt and suffered damages as a result of Debtor's willful and malicious conduct.  The Court received evidence that Plaintiffs paid business expenses or incurred losses in the total sum of $62,044.83.  Assuming this sum defines the scope of Plaintiffs' "injury," the next question is whether Debtor willfully and maliciously caused this injury.

The Bankruptcy Appellate Panel for the Eighth Circuit explained the malice and willfulness elements as follows:

> "The word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury . . ." Kawaauhau v. Geiger, 523 U.S. 57, 61, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998).  The "willful" element is a subjective one.  Blocker v. Patch (In re Patch), 526 F.3d 1176, 1180 (8th Cir. 2008).  "If the debtor knows that the consequences are certain, or substantially certain, to result from his conduct, the debtor is treated as if he had, in fact, desired to produce those consequence[s]." Id.

> Malice requires more than just reckless behavior by the debtor. Scarborough, 171 F.3d at 641 (citing In re Miera, 926 F.2d at 743).  The defendant must have acted with the intent to harm, rather than merely acting intentionally in a way that resulted in harm.  Id.  "'Circumstantial evidence

of the debtor's state of mind [can] be used to ascertain whether malice existed.'" <u>In re Fors</u>, 259 B.R. at 139 (quoting <u>In re Miera</u>, 926 F.2d at 744).

<u>In re Walker</u>, 514 B.R. at 589.  Further, "[m]alice requires conduct more culpable than that which is in reckless disregard of the creditor's economic interests and expectancies." <u>Johnson v. Logue</u> (<u>In re Logue</u>), 294 B.R. 59, 63 (B.A.P. 8th Cir. 2003) (citations omitted). "The debtor's knowledge that he or she is violating the creditor's legal rights is insufficient to establish malice absent some additional aggravated circumstances.  Conduct which is certain or almost certain to cause financial harm to the creditor is required." <u>Id.</u>  Finally, "[w]hile intentional harm may be difficult to establish, the likelihood of harm in an objective sense may be considered in evaluating intent." <u>Id.</u> (citation omitted).

A recent decision from the Bankruptcy Court for the Western District of Missouri discussed section 523(a)(6) in the context of a breach of contract case:

Section 523(a)(6) "sounds in tort, not breach of contract." <u>Jeffries</u>, 378 B.R. at 256 (citation omitted); <u>see also</u> 4 Collier on Bankruptcy ¶ 523.12 [1] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) ("Section 523(a)(6) generally relates to torts and not to contracts.").

In <u>Geiger</u>, the Eighth Circuit was called upon to decide whether § 523(a)(6) requires a willful injury or "an intentional act that results in injury." The Court chose the former, and cited breach of contract as evidence that the latter approach proves too much. <u>Geiger</u>, 113 F.3d at 852 ("[W]e see no reason that a knowing breach of contract would not result in a judgment that would be exempt from discharge under this legal principle.  Surely this proves too much."). The Supreme Court agreed, and compared a knowing breach of contract to an intentional vehicle maneuver that causes unforeseen injury—both would violate the maxim that exceptions to discharge should be narrowly construed. <u>Geiger</u>, 523 U.S. at 62.

Thus, as a general rule, debts resulting from breach of contract, even debts resulting from intentional breach of contract, are not excepted from discharge under § 523(a)(6). <u>In re Johnson</u>, Adv. No. 07–3115, 2007 WL 5065545, at *3 (Bankr. D. Minn. Nov. 14, 2007) (citing <u>In re Glatt</u>, 315 B.R. 501, 511 (Bankr. D.N.D. 2004)); <u>see also</u> <u>In re McDowell</u>, 299 B.R. 552, 555 (Bankr. N.D. Iowa 2003) ("Simple breach of contract . . . is not included in the limited exceptions to discharge in bankruptcy.").

<u>James v. West</u> (<u>In re West</u>), 2017 WL 746250, at *34 (Bankr. W.D. Mo. Feb. 24, 2017).

Plaintiffs assert Debtor intended to cause harm to them because he knew the consequences of his actions were certain, or substantially certain, to cause harm.  They claim Debtor never intended to fulfill his obligations under the agreements.  They maintain that, when Martinez confronted him, Debtor continued to deplete assets that

did not belong to him for his own personal gain.  Additionally, Plaintiffs assert Debtor admitted he took items of personal property that he knew belonged to Plaintiffs.  They assert Debtor wanted to use Plaintiffs' assets for his own personal gain while causing damage to Plaintiffs.  They claim he withheld financial documents Plaintiffs needed during the course of the relationship and after the Lakehouse stopped operating.  The likelihood of harm was certain based on Debtor using funds, taking items and incurring charges.  They argue that Debtor knew Plaintiffs would be damaged by his conduct and "he just did not care."  Doc. 108 at 12.  Plaintiffs also assert that, given Debtor's extensive experience in the hospitality business, "[i]t stands to reason that [Debtor] knew the injury to the Plaintiffs would result from his actions."  Doc. 108 at 11.

The evidence received at trial does not support Plaintiffs' claims that Debtor deliberately or intentionally harmed Plaintiffs before October 16, 2014, the date of the fire.  To the contrary, the evidence shows that Debtor was committed to efficiently operating the Lakehouse, expanding its business and services and making it profitable.  Although Debtor purchased numerous items and paid Lakehouse expenses without authorization from Martinez, these payments (except one[15]) were for business purposes and Debtor spent these funds to improve efficiency or draw more customers—not to harm Plaintiffs.  There were also occasions when Debtor used Lakehouse funds to pay for gasoline and insurance for his truck and telephone charges for his husband, but Debtor explained that he used his truck for business purposes and his husband helped operate the Lakehouse.  Additionally, there is evidence that the Lakehouse was billed for telephone lines not used for restaurant business.  Debtor credibly testified that he (or his friends and family) paid an appropriate share of the personal expenses and he correctly charged the Lakehouse/MarPad for legitimate business expenses.  As noted above, Debtor also credibly explained the reasons for the cash withdrawals and the variation in cash deposits.  The Court found no evidence that, before the fire, Debtor intentionally depleted Plaintiffs' assets for personal gain.  Rather, Debtor worked diligently to make the Lakehouse a success, hoping to complete the buyout arrangement the parties reached.  He took less salary than the parties contemplated in their contracts and he even sought a second job to make the endeavor successful.  While there is no question that Martinez and Debtor had a tumultuous working relationship and that Debtor's lack of communication contributed to their problems, the Court is not convinced that Debtor either intentionally or maliciously injured Plaintiffs before the Lakehouse fire.

After the fire, Debtor removed a fireplace, a heater and liquor from the Lakehouse, without Plaintiffs' consent and during a time when he knew Plaintiffs could not stop him.[16]  The consequence of his actions—injuring Plaintiffs by depriving them of

---

[15] Debtor paid an accountant for fees that were not attributable to the Lakehouse.  The Court is not convinced that the accountant payment was intentional or malicious, however.

[16] Plaintiffs claim that other items were missing after the fire, including kitchen equipment, a laptop computer, USB cable, copy paper, printer, beaded adding pad, six jump drives, a trailer hitch, propane tanks, a smoker, patio heaters, cooler and a roof

these items—was certain to result from his conduct.  The objective likelihood of injury was unquestionable.

Debtor admitted that he took liquor bottles but claimed that he had brought them to the Lakehouse from his previous employment.  He explained that the liquor had been deemed non-sellable and was marked "not-for-customer sale."  Debtor offered no other evidence in support of this explanation and, under the circumstances, the Court does not find his testimony credible or his conduct justifiable.

Debtor also admitted taking the fireplace and heater, but testified that he felt justified in taking these items because he contributed money to the Lakehouse but did not receive any money in return.  This circumstance does not excuse his behavior. Debtor's conduct in removing the liquor, fireplace and heater was deliberate and intentional, and it resulted in harm to Plaintiffs.  Accordingly, the Court finds that Debtor willfully and maliciously injured Plaintiffs by taking the liquor, fireplace and heater.  The debt for these items—$906.98 for the liquor, $299.98 for the fireplace and $119.00 for the heater—is excepted from discharge under section 523(a)(6).

## III.  CONCLUSION

The Court considered all other arguments and deems them to be without merit.

For the reasons stated above, it is **ORDERED** that:

A.  Plaintiffs' claims and causes of action under 11 U.S.C. §§ 727, 523(a)(2)(A) and (a)(4) are dismissed with prejudice.

B.  Judgment shall be entered in favor of the Plaintiffs and against the Defendant in the sum of $1,325.96.  This debt is excepted from discharge pursuant to 11 U.S.C. § 523(a)(6).  All other claims under section 523(a)(6) are dismissed with prejudice.

**JUDGMENT MAY BE ENTERED ACCORDINGLY.**

Dated:  September 29, 2017.

_____/s/ SHON HASTINGS_____
SHON HASTINGS, JUDGE
UNITED STATES BANKRUPTCY COURT

---

carrier.  Some of these items were destroyed during the fire.  Others were never found. Plaintiffs suggest Debtor took them, but offered no evidence to prove this allegation other than Martinez's testimony that these items were missing after the fire and her claim that she limited access to the Lakehouse.  This evidence is not sufficient to show Debtor took these items, and it does not establish a willful and malicious injury in the sum of their value.